IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PATRICIA D. PODSIAD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-841-SLR-LPS |
| | : | |
| MICHAEL ASTRUE, | : | |
| Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

REPORT AND RECOMMENDATION
REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff Patricia Podsiad ("Podsiad") appeals from a decision of Defendant Michael J.

Astrue, the Commissioner of Social Security ("Commissioner"), denying her application for

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§§ 401-433. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before this Court are cross-motions for summary judgment filed by

Podsiad and the Commissioner. (D.I. 13, 16) Podsiad asks this Court to reverse and remand

Defendant's decision. (D.I. 13) Defendant requests that this Court affirm his decision. (D.I. 17)

For the reasons set forth below, both parties' motions will be denied in part and granted in part.

## II.    BACKGROUND

### A.    Procedural History

Podsiad filed her claim for DIB on August 9, 2004. (D.I. 7 ("Transcript" and hereinafter

"Tr.") at 57-61)  The application was denied on October 10, 2005 and again on reconsideration.

Tr. at 5-7, 49-53.  Podsiad filed a request for an administrative hearing on September 30, 2005.

Tr. at 54.  The hearing before an administrative law judge (hereinafter "ALJ") was held on June

22, 2006.  Tr. at 650.  The ALJ issued a decision affirming the denial of benefits to Podsiad on

October 11, 2006.  Tr. at 30.  Podsiad requested a review of the ALJ's decision by the Appeals

Council on October 26, 2006, submitting in support a letter of contentions and 212 pages of

medical evidence not considered by the ALJ.  Tr. at 13-15, 429-649.  The Appeals Council

denied the request on October 30, 2007.  Tr. at 5-8.  The ALJ's October 11, 2006 decision thus

became the final decision of the Commissioner.  Tr. at 5; *see also* 20 C.F.R. §§ 404.955,

404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On December 21, 2007, Podsiad filed a complaint seeking judicial review of the ALJ's

October 11, 2006 decision.  (D.I. 1)  She moved for summary judgment on February 23, 2009.

(D.I. 13)  The Commissioner filed a cross-motion for summary judgment on March 25, 2009.

(D.I. 16)  On June 4, 2009 this case was referred to the undersigned United States Magistrate

Judge.[1]  (D.I. 21)

### B.    Factual Background

#### 1.    Plaintiff's Medical History, Treatment, And Condition

Podsiad was 48 years old at the time she applied for DIB on August 9, 2004, and had

turned 50 by the time the ALJ issued his decision in her case.  *See* Tr. at 16, 40.  She graduated

from high school and completed one year of college courses in business and accounting.  Tr. at

---

[1]Because the parties have not consented to the jurisdiction of a magistrate judge, my
authority with respect to the case-dispositive motions for summary judgment is limited to issuing
a Report and Recommendation.

84, 659.  She is married and lives with her husband, a maintenance worker for Chrysler, her 23-year old son, and her mother.  Tr. at 659-60, 673.  Podsiad's last form of employment was as a customer service supervisor at the U.S. Post Office, for whom she worked from 1986 to 2003.  Tr. at 78, 661-62.  The disability insurance she received from her former employer was due to expire on December 31, 2009.  Tr. at 19, 660.

Podsiad alleges that she became disabled on or about July 7, 2003, around the time she underwent a right shoulder operation after having experienced pain in that extremity for approximately a year.  Tr. at 236-54, 655.  She claims her disability stems from multiple medical problems, including: (1) brachial plexopathy[2] of the right upper extremity; (2) osteoarthritis of the left hip that required a hip replacement; (3) obesity; (4) degenerative disc disease of the cervical spine; (5) depression; and (6) colon cancer and left upper extremity lymphedema.[3]  (D.I. 13 at 4)   She has sought treatment for her physical and mental health issues for several years from many doctors.

**a.      Brachial plexopathy of the right upper extremity**

**i.      Drs. Parul Desai, Barbara Frieman, Selena Xing, and Alex Bodenstab**

Dr. Parul Desai has been Podsiad's family doctor since 1999.  Tr. at 674.  Podsiad had complained to Dr. Desai about chronic pain in her right arm and shoulder region from 2000 to

---

[2]Where the parties have provided definitions of medical terms in their briefs, those definitions are included in this Report.  "Brachial plexopathy" is defined as a disease of the complex network of nerves that is formed chiefly by the lower four cervical nerves and the first thoracic nerve that lie partly within the axilla and supply nerves to the chest, shoulder, and arm. (D.I. 13 at 4 n.2)

[3]"Lymphedema" is defined as edema (swelling) due to faulty lymphatic drainage.  (D.I. 13 at 5 n.3)

2002. Tr. at 147, 150, 154. On April 9, 2003, Podsiad consulted with Dr. Barbara Frieman, an orthopedic specialist, for her shoulder pain. Tr. at 235. At that time, Dr. Frieman diagnosed Podsiad with impingement tendonitis[4] of the right shoulder, rotator cuff tendonitis, lateral epicondylitis,[5] and degenerative disc disease. Tr. at 235. An MRI of Podsiad's right shoulder area taken on May 23, 2003 showed a prominent area of tendonitis involving the distal supraspinatus tendon, either representing tendonitis or focal intrasubstance tear, as well as hypertrophic[6] changes of the acromioclavicular[7] joint. Tr. at 256.

On July 8, 2003, Podsiad underwent an anterior acromioplasty[8] and distal clavicle excision with Dr. Frieman. Tr. at 236-54. There was no evidence of a rotator cuff tear. Tr. at 253. At Podsiad's follow-up visit on July 17, 2003, Dr. Frieman noted that Podsiad's wound was healing nicely and her pain was well controlled. Tr. at 231. By September 17, 2003, Podsiad's normal range of motion had returned to her right shoulder but she needed more aggressive strengthening exercises. Tr. at 230. On October 30, 2003, however, Dr. Frieman noted that after Podsiad returned to full-time duty at work, her job of writing reports on a computer all day long had "totally reaggravated her problems" and her pain had reoccurred completely. Tr. at 229. X-rays taken that day showed no evidence of any complications with Podsiad's acromioplasty or

---

[4]"Tendonitis" is defined as inflammation of the tendon. (D.I. 13 at 5 n.4)

[5] "Epicondylitis" is defined as inflammation of the epicondyle or adjacent tissues, i.e., tennis elbow. (D.I. 13 at 5 n.5)

[6]"Hypertrophic" is defined as excessive development of muscles. (D.I. 13 at 5 n.6)

[7]"Acromioclavicular" is defined as related to the joint between the acromion and the clavicle. (D.I. 13 at 5 n.7)

[8]"Acromioplasty" is defined as an excision of the anterior hook of the acromion for the relief of pressure on the rotator cuff produced during movement of the joint. (D.I. 13 at 5 n.8)

AC joint resection, and showed that Podsiad's bony anatomy was excellent. Tr. at 229. Dr.

Frieman recommended that Podsiad take more time off work and resume her physical therapy

program. Tr. at 229.

On January 7, 2004, Podsiad complained to Dr. Frieman of pain over her brachial plexus,

although Dr. Frieman observed that Podsiad's range of motion was excellent, her wound was

healed, and her strength was well-maintained. Tr. at 227. Dr. Frieman stated that Podsiad's

symptoms of pain and tenderness in the brachial plexus were consistent with possible brachial

plexopathy and recommended an EMG. Tr. at 226. The EMG did not show definite evidence of

brachial plexopathy but was consistent with median nerve entrapment in Podsiad's wrist, *i.e.*,

carpal tunnel syndrome of a moderate to severe degree, and was suggestive of a brachial plexus

injury. Tr. at 224, 259-62.

On April 22, 2004, Podsiad visited Dr. Desai and again complained of pain in her right

shoulder, although some of her other physical difficulties (discussed below) were improving at

that time with medication. Tr. at 164. Podsiad subsequently consulted with Dr. Selena Xing, a

pain management specialist, beginning on May 17, 2004. Tr. at 312-16. Dr. Xing recommended

acupuncture, injections, and medication to manage Podsiad's pain. Tr. at 316. Dr. Xing

repeatedly noted between 2004 and 2006 that Podsiad was disabled and suffered from continued

shoulder, neck, and chest pain of various types. Tr. at 420-28, 494, 497-500. Dr. Xing also

noted that Podsiad could walk without help and could complete all activities of daily living on

her own, albeit with pain. Tr. at 314.

Dr. Frieman noted in her records on June 17, 2004 that Podsiad suffered from brachial

plexopathy and neuropathic[9] pain, right significantly worse than left. Tr. at 224. She opined that Podsiad was permanently partially disabled from the brachial plexopathy and had permanent partial loss of use of her right upper extremity due to the neuropathic pain. Tr. at 224. Although Podsiad's pain initially decreased after the surgery to her right shoulder, afterwards she continued to have pain up and down her right arm. Tr. at 224. Dr. Frieman also noted that Podsiad would probably not be able to return to her position at the post office. Tr. at 224.

Podsiad completed questionnaires for the Social Security Administration in September 2004 and January 2005 that shed further light on her right shoulder's condition during that period. Tr. at 94-101, 118-25. She stated that each morning she awoke to pain in her arm and shoulder, to which she applied either heat or ice until she became mobile enough to begin her day. Tr. at 94, 118. She was able to care for herself generally, but with limitations such as: inability to wear a brassiere due to swelling in her right shoulder and armpit area; inability to blow dry her hair because of arm pain; difficulty bathing her upper back and arm areas; difficulty eating foods that required repetitive motions; and difficulty in taking care of her hygiene during bouts of more extreme arm pain. Tr. at 95, 119. Podsiad was able to cook complete meals, but found that she needed frequent rest and that pain resulted from repetitive tasks like slicing, dicing, and prolonged stirring or frying. Tr. at 96, 120. Regarding household chores, Podsiad reported being able generally to perform most indoor chores (those that did not require lifting her arms), but needed to take frequent breaks and ice her shoulder area. Tr. at 96,120. Podsiad stated that she attempted to go outside every day (as a way to relieve her pain without medication) and was able to drive with one hand and to do her own shopping, although she

---

[9]"Neuropathic" is defined as the degenerative state of the nervous system or nerves. (D.I. 13 at 4 n.1)

needed help from others to carry larger loads of goods. Tr at 97, 121. In September 2004, Podsiad was also able to handle money, pay her bills, write checks, and count change, Tr. at 97, although by January 2005 she could not count change and had trouble writing checks and addressing envelopes. Tr. at 121.

On January 25, 2005, Dr. Desai wrote a letter (without an identified recipient) stating that Podsiad had seen three orthopedic surgeons, had reached her maximum improvement level with regard to her right shoulder, and would be unable to do computer work or writing for more than five minutes, accept mail at public windows, or perform non-supervisory activities. Tr. at 134. Dr. Desai concluded that Podsiad was disabled and indefinitely and completely unable to perform the tasks he described, despite Podsiad's desire to seek all treatments to improve her condition. Tr. at 134.

In March 2005, Dr. Xing issued a medical report on Podsiad's condition stating that Podsiad had been disabled from her position at the post office since October 2003. Tr. at 278. Dr. Xing also noted, generally, that Podsiad's use of her hands and a computer "should be limited." Tr. at 279. A February 11, 2005 MRI of Podsiad's chest ordered by Dr. Xing revealed no abnormalities of the right brachial plexus. Tr. at 390.

On April 14, 2005, Dr. Alex Bodenstab (who performed Podsiad's left hip replacement, described below) saw Podsiad in connection with her problems with her left hip, but noted that Podsiad was developing symptoms suggestive of reflexive sympathetic disorder (RSD) in her upper right extremity and, to some extent, in her upper left extremity. Tr. at 208.

Podsiad continued to see Dr. Xing from April 2005 to January 2006. Dr. Xing's treatment notes from that period show that Podsiad's range of motion in her right upper extremity decreased during this time. Tr. at 423, 420.

### b.       Osteoarthritis of the left hip

### i.       Drs. Alex Bodenstab and Parul Desai

Podsiad has complained to Dr. Alex Bodenstab, an orthopedist, of pain in her left hip

since at least 2001. Tr. at 213. An x-ray taken on February 11, 2004 showed severe destruction

of her left hip with complete loss of the superior joint space and moderate sized acetabular cysts.

Tr. at 210. On March 15, 2004, Podsiad underwent a total left hip arthroplasty, *i.e.*, hip

replacement, performed by Dr. Bodenstab. Tr. at 206, 264-77.

In April 2004, Podsiad told Dr. Desai that she was "doing well" since her hip surgery, but

complained of shoulder pain. Tr. at 164. In May 2004, Podsiad told Dr. Desai that she planned

on walking as her hip improved. Tr. at 170.

Further, x-rays of Podsiad's left hip taken on July 22, 2004 showed that uncemented total

hip implants appeared to be well fixed and in good condition. Tr. at 203, 209. There appeared to

be bony ingrowth into the implants (Tr. at 203, 209), likely signifying less pain and limp (D.I. 17

at 8 n.3). Dr. Bodenstab noted that it had been over four months since Podsiad's left hip

arthroplasty, that she had no pain, and that her leg lengths were approximately equal with no

swelling. Tr. at 209.

Podsiad stated in a September 22, 2004 questionnaire that, following her hip surgery, she

had been able to walk one mile on most days. Tr. at 99. In January 2005, she also stated that she

tried to walk for exercise two or three times per week and could walk a mile without resting. Tr.

at 122-23.

About one year after her hip replacement surgery, Podsiad reported groin and thigh pain

that traveled down to her knee and was worse with sitting and walking. Tr. at 208. X-rays of

Podsiad's pelvis and left hip taken on March 11, 2005 suggested that the implants were still in

good position, but there was some mild radial lucency, suggesting the possibility of failure of bone ingrowth. Tr. at 203. Dr. Bodenstab recommended a bone scan. Tr. at 208. The radionuclide three-phase bone scan performed on March 22, 2005 showed that the left prosthesis was in place, that there was slightly increased activity of the intertrochanteric region of the left hip, subtle increased activity of the left ischial tuberosity[10] which could be due to some degree of stress phenomenon and not necessarily loosening, and that clinical correlation was recommended. Tr. at 216.

Dr. Bodenstab noted in April 2005 that Podsiad might require revision surgery due to uptake behind the acetabulum as well as the inner trochanteric region of the left femur. Tr. at 208. A December 27, 2005 CT scan of the pelvis showed no acute abnormality. Tr. at 414-15. Almost a year later, in March 2006, Podsiad reported ongoing anterior groin, thigh, and hip pain. Tr. at 472. Dr. Bodenstab noted it was possible that bone growth may not have occurred, but did not recommend further surgery at that time. Tr. at 472.

### c.  Obesity

Podsiad's treating physicians continuously diagnosed her with obesity. Tr. at 143, 147, 153, 191-92, 204, 234, 240, 314, 338-40. At a height of about 5 feet and 6 ½ inches, Podsiad's weight, between 2003 and 2006, ranged from 266 to 290 pounds. At the time of the administrative hearing, Podsiad's weight was 267 pounds.

---

[10]"Ischial tuberosity" is defined as bony swelling on the posterior part of the superior ramus of the ischium that gives attachment to various muscles and bears weights of the body in sitting. (D.I. 13 at 7 n.9)

####      d.        Degenerative disc disease of the cervical spine

####          i.        Drs. Frieman, Bodenstab, and Xing

At her first visit with Dr. Frieman in April 2003, Podsiad said she had sustained an injury to her neck in 1996 that had led to treatment for degenerative disc disease. Tr. at 234. Dr. Bodenstab had ordered that an MRI be taken of Podsiad's cervical spine on March 2, 2000, which showed annular bulging at several levels in the cervical spine with a central disc herniation at the C3-C4 levels, and a Chiari Type I malformation[11] of the posterior fossa with no definite syringomyelia. Tr. at 194, 221. By the time Podsiad saw Dr. Frieman in April 2003, Podsiad had excellent range of motion of her cervical spine without causing any pain to her shoulders. Tr. at 234. One month later, however, Podsiad complained of a great deal of burning pain in her right shoulder, some of which appeared to be neck pain. Tr. at 233.

In June 2003, Dr. Frieman noted that Podsiad understood that she would continue to have neck pain due to her degenerative disc disease, even if the shoulder pain was lessened through surgery. Tr. at 232. An MRI taken of the cervical spine on May 28, 2003 showed posterior disc protrusion and annular tear at C3-C4 that was in contact with, but not compressing, the ventral cord, as well as a Chiari I malformation. Tr. at 255-56. The remainder of the interspaces between vertebrae were normal. Tr. at 255-56. In December 2003, Dr. Frieman again stated that Podsiad complained of pain radiating from her neck to her shoulders. Tr. at 228.

When Podsiad first consulted with Dr. Xing on May 17, 2004 for pain management, she complained of pain, tightness, and pressure in her anterior neck. Tr. at 312-13. Two tests

---

[11]An Arnold Chiari malformation is a congenital anomaly in which the cerebellum and medulla oblongata, which is elongated and flattened, protrude into the spinal canal. (D.I. 17 at 5 n.1)

conducted by Dr. Xing to detect nerve impingement were positive. Tr. at 315. From June 2004

through April 2005, muscle strength and range of motion for Podsiad's head, neck, and spine

were all within normal limits, despite her complaints of pain. Tr. at 281, 285-86, 290-91, 293-

94, 299-300, 302-03, 305-08, 310-11, 425-28. A June 11, 2004 bone scan ordered by Dr. Xing

revealed degenerative changes in the lower left cervical spine and proximal thoracic spine, but

the shoulder girdle itself was unremarkable. Tr. at 393.

A March 22, 2005 bone scan also revealed findings consistent with facet athrosis

(degenerative changes of the facet joints) at L5 bilaterally. Tr. at 216. A July 5, 2005 MRI of the

cervical spine showed that mild concentric disc bulges were present at C3-C4, but that there was

no evidence of cord compression or neural foraminal narrowing. Tr. at 386. A July 25, 2005

EMG showed findings indicative of chronic right C5 radiculopathy/radiculitis. Tr. at 385. There

was also some degree of peripheral polyneuropathy[12] in the bilateral upper limbs with multiple

nerve involvement pattern, but the EMG did not show definite axonal[13] involvement. *Id.*

### e.    Depression

#### i.    Drs. Parul Desai and John Dettwyler

Dr. Desai's records show that as of May 2003, Podsiad was reporting symptoms of

depression and insomnia. Tr. at 157. Later records indicate that she suffered from anxiety and

crying as well. Tr. at 165.

---

[12]"Peripheral polyneuropathy" is defined as the disease or degenerative state of the peripheral nerves in which motor, sensory, or vasomotor nerve fibers may be affected and which is marked by muscle weakness and atrophy, pain, and numbness. (D.I. 13 at 9 n.10)

[13]An axon is the long fiber of the nerve cell (a neuron) that acts like a fiber-optic cable carrying outgoing messages. (D.I. 17 at 13 n.12)

At Dr. Desai's request, Podsiad saw Dr. John Dettwyler[14] on November 16, 2004 for depression and mood changes secondary to pain and disability. Tr. at 364. She continued to see Dr. Dettwyler until April 1, 2005. Tr. at 357-64. On August 17, 2005, Dr. Dettwyler completed a psychiatric assessment form on Podsiad's behalf at the SSA's request. Tr. at 351-54. He diagnosed her with adjustment disorder with mixed anxiety and depression, although he did not perform any psychological testing or other mental status exam. Tr. at 354-64. Dr. Dettwyler also noted that Podsiad complained of pain, had problems coping with her pain and weight, and expressed frustration over the fact that she probably did not have a case for workers' compensation. Tr. at 354-64. On the SSA form, Dr. Dettwyler noted that Podsiad's affect was flat; that her association and thought process was within normal limits; her thought content was appropriate; her perception was normal; her "sensory [sic], memory, and orientation" were normal; her intellectual functioning was high average to superior; and that her insight and judgment were good. Tr. at 352-53. Dr. Dettwyler recommended pain management and weight loss. Tr. at 354.

### f.  Colon cancer

#### i.  Drs. Parul Desai and Theresa Gillis

On December 27, 2005, Podsiad was diagnosed with stage III B colon adenocarcinoma, *i.e.*, colon cancer (Tr. at 413-14, 431), after having complained to Dr. Desai of unusual abdominal pain and rectal bleeding on October 31, 2005 (Tr. at 554-55). A February 15, 2006 CT scan of the abdomen revealed a small left adrenal nodule, suggesting a lipid poor adenoma.

---

[14]Presumably, Dr. Dettwyler is the psychologist Podsiad testified that she saw for her depression, although neither party confirms whether he is a psychologist or psychiatrist. *See* Tr. at 670.

Tr. at 419.  On February 20, 2006, Podsiad started chemotherapy, which lasted until August 1, 2006.  Tr. at 505-39.  There were complications from the chemotherapy, including left arm lymphedema.  Tr. at 486-91, 559-60.  Podsiad reported symptoms of pain and pressure in the fingers of her left hand, as well as an increase in dropping items.  Tr. at 493.  She also reported being functionally able to do things with her left hand but with pain.  Tr. at 493.  Podsiad participated in physical therapy for the swelling in her left arm and hand in September and October 2006.  Tr. at 492-93.  In October 2006, Dr. Theresa Gillis recommended a semi-customized glove to help control Podsiad's lymphedema.  Tr. at 487.

### g.    State Agency Consultants and Physicians

A state agency non-examining medical consultant reviewed Podsiad's records on October 14, 2004.  Tr. at 319-26.  Another state agency non-examining medical consultant, Dr. Borek, first reviewed Podsiad's file on February 3, 2005.  Tr. at 329-37.  On July 6, 2005, Dr. Yong K. Kim performed a consultative physical examination for the Disability Determination Service.  Tr. at 345-50.  On July 28, 2005, Dr. Borek wrote an addendum based upon additional medical information, including Dr. Kim's conclusions from his July 6, 2005 examination of Podsiad.  Tr. at 338-40.[15]  The opinions of these consultants and physicians with respect to Podsiad's allegedly disabling ailments are described below.

### i.    Brachial plexopathy of the right upper extremity

On October 14, 2004, a non-examining medical consultant found that Podsiad could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of

---

[15]The Commissioner's brief misinterprets page 342 of the Transcript as the July 28, 2005 addendum written by Dr. Borek.  (D.I. 17 at 15)  It appears, instead, that Podsiad is correct when she asserts that Transcript page 342 is a form completed by the disability adjudicator (apparently a non-physician), prior to Dr. Borek's review of Podsiad's file.  (D.I. 18 at 4)

about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and that Podsiad's ability to push and/or pull was limited in the right upper extremity. Tr. at 320. The state agency consultant also determined that Podsiad had unlimited ability to reach in all directions, including overhead, with the left arm, and that she could reach in all directions with the right arm frequently, although not constantly. Tr. at 322. The state agency consultant concluded that Podsiad should avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery. Tr. at 323. The disability "adjudicator"[16] who completed form SD-1 before the state agency non-examining physician reviewed Podsiad's file determined that Podsiad had the residual functional capacity ("RFC") for light work.[17] Tr. at 328.

On February 3, 2005, Dr. Borek found that Podsiad could lift and/or carry 10 pounds occasionally and 5 pounds frequently, stand and/or walk for a total of at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and that Podsiad was limited to frequent (but not constant) pushing and/or pulling with her bilateral upper extremities. Tr. at 330. Dr. Borek also determined that Podsiad could reach (including overhead) with both extremities on an occasional basis, that she could handle and finger with both upper extremities

---

[16]Both reports from the state agency medical consultants in the record are succeeded by two-page documents from the Delaware Disability Determination Service which appear to have been completed by "adjudicators." *See* Tr. at 319-44. The documents do not specify whether these adjudicators are physicians. Podsiad claims that the adjudicator who filled out the July 25, 2007 report, whose name is illegible, is not a physician.

[17]"Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b). Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *Id.*

frequently, but not constantly, and that her ability to feel was unlimited. Tr. at 331-32. Dr.

Borek concluded that Podsiad should avoid concentrated exposure to extreme cold, vibration,

and hazards such as machinery. Tr. at 333.

On July 6, 2005, Dr. Yong K. Kim performed a consultative physical examination for the

Disability Determination Service, during which Podsiad complained of pain in her neck,

shoulders, and both upper extremities, more on the right than left. Tr. at 345-50. Podsiad told

Dr. Kim that she was limited to lifting 10 pounds because of right arm pain. Tr. at 345. She

stated that she could stand for 30 minutes at a time, and sit for one hour at a time. Tr. at 345.

Range of motion of both her upper and lower extremities was within normal limits, except for

her left hip where internal and external rotations were limited. Tr. at 346, 349. Podsiad's range

of motion of the bilateral shoulders was within normal limits. Tr. at 346. Podsiad was alert and

oriented x3 (to person, place, and time); her memory was intact; her affect was appropriate; fine

finger movement was within normal limits on both sides; sensation was normal in both the upper

and lower extremities; a Tinel test[18] was mildly positive bilaterally; a Phalen test[19] was negative

bilaterally; muscle strength of both upper and lower extremities was within normal limits; there

was no evidence of muscle atrophy; and grip strength was generally equal between both hands,

though the right was dominant, and within normal limits. Tr. at 346-47. Dr. Kim diagnosed

Podsiad with cervical radiculopathy, thoracic outlet syndrome, bilateral carpal tunnel syndrome,

and left hip and right shoulder pain. Tr. at 347. Dr. Kim concluded that Podsiad could walk and

stand for four to six hours during an eight-hour workday, sit for four to six hours during an eight-

---

[18]A positive Tinel test indicates a partial lesion or the beginning of regeneration of the nerve over the site of a divided nerve. (D.I. 17 at 10 n.6)

[19]A Phalen test is administered to detect carpal tunnel syndrome. (D.I. 17 at 10 n.5)

hour workday, and lift 10-20 pounds. Tr. at 347. Dr. Kim did not discuss Podsiad's obesity.

On July 28, 2005, Dr. Borek determined in his addendum to his previous findings that Podsiad had the maximum residual functional capacity to perform sedentary work,[20] considering her morbid obesity and other health issues. Tr. at 339. He further stated that Podsiad's use of both her upper extremities should be noncontinuous, but he did not state that she was precluded from all working activity. Tr. at 340.

### ii. Osteoarthritis of the left hip

The October 2004 assessment of Podsiad's file by a state agency medical consultant found that Podsiad could lift and/or carry 20 pounds occasionally, and 10 pounds frequently, and stand, sit, and/or walk for a total of six hours out of an eight-hour workday. Tr. at 320. The state agency consultant also found that Podsiad could climb ramps and stairs frequently and ladders/ropes occasionally, and that she could balance and stoop frequently but kneel, crouch, and crawl only occasionally. Tr. at 321.

At Dr. Kim's July 6, 2005 examination, Podsiad told Dr. Kim she could walk one-half to three-quarters of a mile, despite her hip pain. Tr. at 345. She said she could stand for 30 minutes at a time and sit for one hour at a time. Tr. at 345. Her range of motion for her left hip was limited to 30 degrees for internal rotation and 40 degrees for external rotation. Tr. at 346, 349. The range of motion for her left hip was otherwise normal. Tr. at 346. Sensation and muscle strength were normal in her lower extremities, and she could stand on her heels and toes. Tr. at

---

[20]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. § 404.1567(a). Although a sedentary job is involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. *Id.* Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *Id.*

346-47. Dr. Kim concluded that Podsiad could walk and stand for four to six hours during an eight-hour workday, sit for four to six hours during an eight-hour workday, and lift 10-20 pounds. Tr. at 347.

Dr. Borek's assessment of Podsiad's file in February 2005 found that Podsiad could stand and/or walk for at least two hours in an eight-hour workday and sit for six hours in an eight-hour workday. Tr. at 330. He also determined that Podsiad could climb, balance, stoop, kneel, and crawl occasionally. Tr. at 331-32. Dr. Borek also noted the file's lack of a medical evaluation report from Podsiad's orthopedist, Dr. Bodenstab, and questioned whether Podsiad would need a cane to walk due to her left hip problems. Tr. at 337-40. If so, Dr. Borek stated that Podsiad might be rendered more sedentary. Tr. at 378. Dr. Borek further stated there was a need for the disability adjudicator to obtain a medical evaluation report from Dr. Bodenstab regarding Podsiad's possible need of a cane. Tr. at 378. Dr. Borek determined that Podsiad had the maximum residual functional capacity to perform sedentary work, considering her morbid obesity and other health issues. Tr. at 339-40.

### iii.    Obesity

The October 2004 state agency assessment of Podsiad's file does not discuss Podsiad's obesity, aside from the non-physician adjudicator's note that Podsiad was 5 feet and 7 inches tall and weighed 270 pounds at the time of review. Tr. at 319-28. Similarly, aside from noting Podsiad's height and weight on the date of his examination (5' 6.5" and 285 lbs.), Dr. Kim's records do not address the impact of Podsiad's obesity on her ability to work or otherwise. Tr. at 345-50.

Dr. Borek, however, noted Podsiad's obesity in the following contexts: (1) precluding Podsiad from using ladders, ropes, or scaffolds due to "morbid obesity;" (2) directing Podsiad to

avoid concentrated exposure to work hazards due to her "morbid obesity;" (3) twice noting that Podsiad's height and weight profiles categorized her as having "class III morbid obesity;" and (4) determining that Podsiad's maximum RFC was for sedentary work, "especially" with her morbid obesity and other problems.  Tr. 331, 333, 336-40.

### iv.    Degenerative disease of the cervical spine

The October 2004 assessment of Podsiad's file by a state agency medical consultant acknowledged Podsiad's history of chronic neck pain, but found that Podsiad could lift and/or carry 20 pounds occasionally and 10 pounds frequently, and stand, sit, and/or walk for a total of six hours out of an eight-hour workday.  Tr. at 320.

Dr. Kim's examination of Podsiad revealed that she had neck pain, but the range of motion of her cervical spine was within normal limits in all directions.  Tr. at 345-46.  Trunk flexion was also normal.  Tr. at 346.  Dr. Kim concluded that Podsiad could walk and stand for four to six hours during an eight-hour workday, sit for four to six hours during an eight-hour workday, and lift 10-20 pounds.  Tr. at 347.

Dr. Borek's initial assessment of Podsiad's file noted her history of chronic neck pain. Tr. at 336-37.  His addendum also noted that Podsiad complained of neck pain to Dr. Kim.  Tr. at 338.  Dr. Borek determined that Podsiad had the maximum residual functional capacity to perform sedentary work, considering her morbid obesity and other health issues.  Tr. at 339.

### v.    Depression

On August 19, 2005, Dr. Fugate, Ph.D., a state agency psychologist, competed a psychiatric review technique form, covering the period July 3, 2005 to August 19, 2005.  Tr. at 365-78.  Dr. Fugate found that Podsiad had an affective disorder (adjustment disorder with depressed mood) that was not severe within the meaning of the Commissioner's social security

regulations. Tr. at 365, 368. Dr. Fugate also found that Podsiad had mild restriction of her daily living activities, no difficulties maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. Tr. at 375. Dr. Fugate determined that Podsiad could perform the basic mental demands of routine work. Tr. at 377.

### vi.    Colon cancer

The record does not contain a state agency physician's review of Podsiad's medical records with respect to her colon cancer. Presumably, this is because the last date of such a review was July 28, 2005 (when Dr. Borek inserted an addendum to his report), which predates Podsiad's cancer diagnosis by several months.

### 2.    The Administrative Hearing

Podsiad's administrative hearing was held on June 22, 2006, at which time the ALJ heard testimony from Podsiad and a vocational expert, Dr. James Ryan. Tr. at 651. After the ALJ advised Podsiad that he would continue the hearing if Podsiad decided she wanted the assistance of counsel, Podsiad elected to proceed with the hearing without a representative. Tr. at 652-55.

### a.    Podsiad's testimony

Podsiad testified that she is 5' 7" tall and weighed 267 pounds. Tr. at 658. She completed high school and attended some college. Tr. at 658. She had worked for the U.S. Postal Service since 1986 and was a supervisor there from 2000 to 2003. Tr. at 662-63. Podsiad stated that she has constant burning right arm pain that travels across her chest and shoulder and causes migraine headaches and vomiting. Tr. at 663-64. Her right arm swells, becomes inflamed, and worsens with use. Tr. at 664. The pain in her right arm disrupts her sleep and can be severe. Tr. at 664. She also testified that her doctor was attempting to rule out RSD. Tr. at

664. She commented that the pain occasionally travels to her left arm, which she believes is due to overuse of the left arm to compensate for her inability to fully use her right arm. Tr. at 665. Podsiad further testified that she continues to see Dr. Xing, the pain management specialist, on a regular basis, and had done so most recently within the three months prior to the administrative hearing. Tr. at 674. She also stated that she had another appointment with Dr. Xing set for the end of July 2006. Tr. at 674.

With respect to her left hip, Podsiad testified that she still has problems, despite replacement surgery. Tr. at 666. She said that her surgeon was unsure as to the cause of her ongoing left hip pain and that she still sees him every six months. Tr. at 667. She also testified that the hip pain grows worse with walking and becomes severe – going down her leg – if she spends too much time on her leg. Tr. at 667-68.

Podsiad testified that she had surgery for her colon cancer in January 2006. Tr. at 658. She stated that she was having side effects from the chemotherapy, including pain in her arm. Tr. at 668-69. Before being diagnosed with colon cancer, Podsiad had experienced a lot of pain in her left lower abdominal area near the hip and blood in her stool. Tr. at 669. In response to the ALJ's question as to whether her cancer had reoccurred, Podsiad responded that she had yet to go for a further checkup. Tr. at 669.

Podsiad also stated that she has depression and had seen a psychologist for a couple of months. Tr. at 670. Podsiad testified that she takes Neurontin, which causes her to lose her train of thought, Skelaxin, and Tylenol with Codeine, which causes her sleepiness. Tr. at 671.

Regarding her functional limitations, Podsiad testified that she is able to lift five to ten pounds. Tr. at 671. She can walk one-half to three-quarters of a mile before she must stop and rest because of hip pain. Tr. at 672. She can sit for periods of time but sometimes cannot lean

back due to her arm pain. Tr. at 672. She reported experiencing more pain in cold, damp weather. Tr. at 672. She also stated that when she had still been working, computer use would cause her right arm and shoulder to radiate pain, leading to migraines. Tr. at 663-64.

Podsiad stated that she spends most of the day sitting and watching television. Tr. at 672. She needs to limit how much she cleans her house because she becomes too fatigued. Tr. at 673. Her mother and husband help her with the cooking and laundry. Tr. at 673. She occasionally attends church services but does not go out to eat. Tr. at 673.

Podsiad objected to the ALJ ascribing significance to Dr. Kim's report, stating that her entire visit with Dr. Kim (including exam and wait time) was 30 minutes long and that a language barrier had prevented effective communication. Tr. at 656-57. In response to the ALJ's question, Podsiad stated that she believed all the evidence was in the file. Tr. at 657.[21]

### b.    Vocational expert's testimony

A vocational expert, Dr. James Ryan, testified that Podsiad's past work in the U.S. Postal Service as a customer service supervisor was classified as a medium, skilled job. Tr. at 675. The ALJ asked Dr. Ryan to assume that a hypothetical individual: (1) had pain and discomfort in the right upper extremity of a moderate nature, severe on occasion, with some radiation and spasm; (2) had obesity, indicating that she weighed 267 pounds; (3) derived some sleepiness from her medications but without significant side effects; (4) would need jobs that would generally be performed with one hand, noting that the individual would be right-hand dominant; (5) could lift 10 pounds frequently and 20 pounds occasionally with one or both hands; (6) would need to sit 20 minutes and stand 20 minutes on an alternating basis throughout an eight-hour workday;

---

[21]The ALJ's precise question was "Do you believe all the documents or medical records that you know of are contained in the file?" Tr. at 657. Podsiad's response was "I believe so, sir." Tr. at 657.

(7) would need to avoid prolonged climbing, balancing, and stooping; (8) would need to avoid temperature and humidity extremes, heights, and moving or hazardous machinery; (9) and would require a "low stress job, low concentration due to her pain and depression;" and (10) would require a job that would allow her to avoid repetitive neck turning due to shoulder problems. Tr. at 676-77. Dr. Ryan testified that such an individual having Podsiad's vocational history and physical limits could perform the light, unskilled jobs of: (a) clerical worker; (b) trim machine operator; and (c) inspector, or could perform the sedentary, unskilled jobs of: (d) quality control worker; (e) dispatcher; and (f) table worker. Tr. at 677. In response to Podsiad's question as to the level of hand manipulation required by the clerical worker job, Dr. Ryan testified that the general clerical worker job would not require extensive typing. Tr. at 679. He also stated that the inspector job would not require much working with the hands. Tr. at 679.

Dr. Ryan stated that his testimony was consistent with the Department of Labor's Dictionary of Occupational Titles ("DOT"). Tr. at 678. He explained that the DOT did not use the terminology "sit/stand option," but that he relied on the DOT (and supplements to it) to the extent that it addressed how jobs are actually performed; he further drew on his 25 years of experience as a vocational expert. Tr. at 678. Dr. Ryan further testified that his assessment of Podsiad's past relevant work was consistent with the DOT, and that the hypothetical individual described by the ALJ would not be able to perform Podsiad's past relevant postal service jobs. Tr. at 678.

### 3.     The ALJ's Findings

On October 11, 2006, the ALJ issued the following findings:[22]

---

[22]The ALJ's factual findings have been extracted from his decision, which interspersed factual findings and commentary.

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.     The claimant has not engaged in substantial gainful activity since July 7, 2003, the alleged onset date (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3.     The claimant has the following severe impairments: right shoulder neuropathic pain status post a right shoulder acromioplasty and resection, osteoarthritis of the left hip status post total left hip [re]placement, degenerative disc disease of the cervical spine, obesity, and colon cancer status post chemotherapy (20 C.F.R. 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of light work, with lifting up to 10 pounds frequently with the left (non-dominant) hand only (due to her right shoulder problems), sitting/standing for 20 minutes at a time, and avoiding prolonged sitting or standing (due to her left hip problems). From a nonexertional standpoint, the claimant would have to avoid balancing, climbing, stooping, and repetitive neck turning (which might exacerbate problems with her hip or neck), and she would be limited to low stress jobs, not requiring more than low levels of concentration (to accommodate the effects of pain, fatigue, and medication side effects).

6.     The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.     The claimant was born on March 21, 1956 and was [47] years old on the alleged disability onset date, which is defined as a younger individual age 45-49 (20 C.F.R. 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 C.F.R. 404.1560(c) and 404.1566).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from July 7, 2003 through the date of this decision (20 C.F.R. 404.1520(g)).

Tr. at 21-29.


## III.  LEGAL STANDARDS

### A.  Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted). If the Court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (internal quotation marks omitted).

### B.  Review Of The ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383 (c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487

U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that he or she was disabled prior to the date he or she was last insured. *See* 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not

engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the

Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B.      Podsiad's Arguments On Appeal

Podsiad presents five arguments on appeal: that the ALJ (1) failed to fulfill his duty to adequately develop the record in light of Podsiad's unrepresented status at the hearing; (2) erred by selectively relying on portions of the opinions of Podsiad's treating physicians without explaining why the entirety of the opinions was not accepted; (3) failed to comply with Social Security Regulation ("SSR") 96-6p by ignoring the opinion of Dr. Borek (one of the state agency's non-examining physicians) without providing reasons for rejecting that evidence; (4) erred as a matter of law by failing to consider the impact of Podsiad's obesity on her ability to work; and (5) failed to sustain his burden of establishing that there is other work in the national economy that Podsiad can perform. (D.I. 13 at 1)

### 1.      Whether the ALJ failed to fulfill his duty to adequately develop the record in light of Podsiad's unrepresented status at the hearing

#### a.      Podsiad's arguments

Podsiad argues that Third Circuit law demands that when a claimant is unrepresented, the ALJ has an enhanced duty to develop the record and hold a full and fair hearing. (D.I. 13 at 13) In support of her position, Podsiad cites *Sanchez v. Commissioner of Social Security*, 271 Fed. Appx. 230, 233 (3d Cir. 2008), in which the ALJ kept the record open after the administrative hearing had completed in order to solicit and receive additional evidence on behalf of an

unrepresented claimant. There the Third Circuit found that the ALJ had properly fulfilled his duty to develop the record by issuing post-hearing subpoenas to relevant medical providers and considering the resulting records. *Id.* Podsiad also cites *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). In *Reefer*, the claimant testified that she had suffered a stroke, but the ALJ did not follow up about the stroke even though it would have been relevant to a determination of the claimant's disability. *Id.* at 380. The Third Circuit remanded the case because the ALJ failed to adequately develop the *pro se* claimant's case by neglecting to request additional medical records or hold another hearing. *Id.* at 380-82. Podsiad argues that it follows from *Sanchez* and *Reefer* that the ALJ did not fulfill his duty to develop the record because he did nothing to pursue evidence relevant to Podsiad's testimony regarding her "new diagnosis of colon cancer and the resulting left arm pain" or her stated ongoing left hip pain. (D.I. 13 at 14)

With respect to the left arm pain resulting from chemotherapy for colon cancer, Podsiad contends that the ALJ noted the potential relevance of this issue by finding that "'it is unclear to what extent the claimant's colon cancer and/or its treatment will affect her condition over time.'" *Id.* (quoting Tr. at 26). Podsiad maintains that the medical evidence in the record, discussed above, demonstrates the importance of Podsiad's left arm lymphedema on her disability determination. *See* Tr. at 486-93, 499, 559-60. Since the ALJ obtained no evidence regarding Podsiad's left arm symptoms, she concludes the record was inadequate.

Second, the ALJ stated in his opinion that Podsiad did not seek any treatment for her left hip pain after being released by her orthopedist, Dr. Bodenstab. Tr. at 26. The ALJ specifically noted that this lack of continued treatment influenced his credibility determination of Podsiad's pain complaints. Tr. at 28. However, Podsiad testified at the hearing that she continued to see Dr. Bodenstab for her left hip and had ongoing pain after the replacement surgery. Tr. at 666-68.

Podsiad argues that had the ALJ requested updated records from Dr. Bodenstab, the ALJ would have learned that Podsiad continued to seek treatment, consistent with her testimony. (D.I. 13 at 14-15)

### b.    The Commissioner's arguments

The Commissioner objects to the Court evaluating the additional medical records predating the ALJ's October 11, 2006 decision because they are not new; they were "in existence and available to Podsiad at the time of the administrative proceeding." (D.I. 17 at 23)  Moreover, according to the Commissioner, the records dated after the October 11, 2006 decision are not "material," because they do not pertain to the relevant time period in this case, which the Commissioner contends ended on October 11, 2006, and because they would not have changed the ALJ's decision even if submitted. *Id.* Specifically, the Commissioner maintains that the additional medical records show that Podsiad's cancer treatments were going well after the administrative hearing, and that her hip and right shoulder problems were improving as well. *Id.* at 24-27. The Commissioner also objects to the inclusion of the additional medical records because Podsiad has not shown "good cause" as to why they were not submitted to the ALJ. *Id.*

### c.    Discussion

"Part and parcel to the issue of whether the Commissioner's findings of fact are supported by substantial evidence is the question of whether the ALJ sufficiently developed the record upon which such findings were based." *Facyson v. Barnhart,* 2003 U.S. Dist. LEXIS 9770, at *9 (E.D. Pa. May 30, 2003). Hence, the findings of the ALJ cannot be said to be supported by substantial evidence if the record upon which those findings are based has not been sufficiently developed. *Id.* An ALJ has a heightened duty to a *pro se* claimant to help him or her develop the administrative record. *See Reefer,* 326 F.3d at 380. Here, Podsiad submitted the medical records

30

she believed the ALJ should have obtained (the "additional medical records") to the Appeals

Council after the administrative hearing. Tr. at 644-49. However, even if the ALJ had kept the

record open following the hearing or issued subpoenas to obtain the additional medical records –

steps which Podsiad acknowledges would have fulfilled his duty to her as a *pro se* claimant – the

Court concludes that they would not have led the ALJ to decide differently.

Evidence that was not submitted to the ALJ can be considered by the Appeals Council or

the District Court as a basis for remanding the matter to the Commissioner for further

proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews v. Apfel*, 239

F.3d 589, 592 (3d Cir. 2001). However, in the Third Circuit, in order for evidence that was not

submitted to the ALJ to be considered by a District Court as a basis for remand, the evidence

"must not only be new and material but also be supported by a demonstration by claimant of

good cause for not having incorporated the new evidence into the administrative record."

*Matthews*, 239 F.3d at 592 (internal citation omitted). "New evidence" must actually be "new"

and "not merely cumulative of what is already in the record." *Szubak v. Secretary of Health and

Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). In order for evidence to be deemed "material,"

"it must be relevant and probative" and present a reasonable possibility that it would have altered

the outcome of the Commissioner's determination. *Id.* Thus, "[a]n implicit materiality

requirement is that the new evidence relate to the time period for which benefits were denied, and

that it *not concern evidence of a later-acquired disability or of the subsequent deterioration of

the previously non-disabling condition.*" *Id.* (emphasis added). Finally, the "good cause"

element requires the claimant to articulate a "good reason" for having failed to present the

evidence to the ALJ. *See Matthews*, 239 F.3d at 592.

Podsiad argues that her additional medical records would have impacted the ALJ's

assessment of her RFC. Podsiad's administrative hearing was held on June 22, 2006. The ALJ

issued his decision denying Podsiad's application for disability benefits on October 11, 2006.

Podsiad submitted 212 pages of additional medical records to the Appeals Council in connection

with her request for review of the ALJ's decision. However, many of the additional medical

records concern treatments or doctor's visits that occurred **after** the ALJ issued his decision.

Records postdating the ALJ's decision are not to be considered.[23] *See Shuter v. Astrue*, 537 F.

Supp. 2d 752, 757 n.4 (E.D. Pa. 2008); *Rodriguez v. Barnhart*, 2004 U.S. Dist. LEXIS 3947, at

*28 (D. Del. Mar. 10, 2004).

Even assuming that Podsiad's temporally relevant additional medical records (*i.e.*, those

dated no later than October 11, 2006) are "new" and she has articulated a "good reason" for not

submitting them to the ALJ, nothing in them would have impacted the ALJ's disability

determination.[24] Remand on this basis is thus not warranted. *See Rutherford*, 399 F.3d at 552-53

(holding that remand to permit ALJ to explicitly consider evidence was not warranted where the

evidence would not affect the outcome of case).

Podsiad argues that if medical records concerning her colon cancer treatment – a fairly

recent diagnosis at the time of the administrative hearing – and her resulting left hand

---

[23]Both Podsiad and the Commissioner relied on medical records dated after October 11, 2006 – the day the ALJ issued his decision – in their briefs. After reviewing these records, I am persuaded that these records undermine Podsiad's claims. For example, as of March 2007, Dr. Bodenstab found it "difficult to imagine" that the hip pain Podsiad complained of was coming from her left hip. Tr. at 474. He did not believe that Podsiad had RSD in her left hip, because no other symptoms of RSD (aside from pain) were present. Tr. at 474. Further, an MRI taken on May 9, 2007 of Podsiad's lumbar spine showed minimal spondylolisthesis (a type of birth defect) at the L5-S1 level. Tr. at 588.

[24]Nonetheless, if the Court adopts my Recommendation to remand this case so the Commissioner may attempt to reconcile the conflict between Dr. Borek's opinion and those of the other state agency medical consultants (see below), nothing prevents the ALJ from considering the additional medical records as part of the remand.

lymphedema caused by chemotherapy[25] had been before the ALJ, the ALJ's decision would have been affected. (D.I. 13 at 13-15)  The ALJ noted in his decision that Podsiad's RFC allowed her to lift 10 pounds frequently with the left hand only (due to her right shoulder problems).  Tr. at 23.  Because the lymphedema pained Podsiad and caused her to drop things more often with her left hand, Podsiad argues that the additional medical records would have impacted the ALJ's determination regarding her left hand's functional ability.  Podsiad's contention is undermined, however, by the fact that the additional medical records show that Podsiad's left arm lymphedema was improving with treatment during the period between the hearing and the ALJ's decision.  *See, e.g.*, Tr. at 439-43, 486-93.

Podsiad next argues that the additional medical records pertaining to her continued visits to Dr. Bodenstab for her left hip pain would have impacted the ALJ's decision.  (D.I. 13 at 14-15)  This is primarily because the ALJ incorrectly noted in his decision that Podsiad had not continued to see Dr. Bodenstab after performing Podsiad's hip replacement.  Tr. at 26.  Podsiad's testimony that she continued to see Dr. Bodenstab after her surgery for continued hip pain was substantiated by the additional medical records.  *Compare, e.g.,* Tr. at 666-68 *with* Tr. at 208, 472-74.  Nevertheless, the additional medical records show that Dr. Bodenstab did not believe further hip surgery was necessary, and that x-rays did not reveal any observable problems with the left hip implants.  Tr. at 472-73.  Given that the ALJ's RFC analysis included specific restrictions to accommodate Podsiad's left hip pain, Tr. at 23, and that Podsiad's hip improved in the months between the administrative hearing and the ALJ's decision, the Court does not

---

[25]On October 5, 2006, Dr. Theresa Gillis diagnosed Podsiad with controlled lymphedema of the left hand as a secondary result of her chemotherapy treatment.  Tr. at 486-87.  Podsiad complained to her of swelling in her left hand and arm that sometimes caused painful pressure.  Tr. at 486-87.

believe the ALJ's determination of Podsiad's RFC would have been different if the additional

medical records had been obtained.

**2.     Whether the ALJ erred by selectively relying on portions of the opinions of Podsiad's treating physicians without explaining why the entirety of the opinions was not accepted**

**a.     Podsiad's arguments**

The ALJ gave controlling weight to the opinions of Podsiad's treating physicians, Drs.

Frieman, Desai, and Xing, determining that those opinions were well supported by clinical and

laboratory findings, and not inconsistent with substantial evidence in the record.  Tr. at 26-27.

The ALJ read those opinions' restrictions as applying only to Podsiad's ability to return to her

past job, not to her inability to engage in "any" work.  Tr. at 27.  Podsiad argues that while the

ALJ mentioned in his decision the restrictions Podsiad's treating physicians identified for her –

limiting the use of her right upper extremity, including computer use, paperwork, and

handwriting, and avoiding prolonged sitting – the ALJ did not explain his reasons for failing to

agree with these restrictions (which is especially troubling given his other reliance on the treating

physicians' opinions). *See* Tr. at 23-28.  Nor did the ALJ question the vocational expert

regarding how these specific restrictions would have affected someone with Podsiad's ability to

work.  Tr. at 29.  Podsiad argues that, pursuant to SSR 96-2p, the ALJ was required to state

specific reasons for rejecting the treating physicians' restrictions.  (D.I. 13 at 18)  Because the

ALJ did not explain the reasoning behind his selective rejection, Podsiad asserts, he erred.

**b.     The Commissioner's arguments**

The Commissioner argues that the ALJ did not ignore the restrictions outlined by

Podsiad's treating physicians and, in fact, "fully accommodated" these restrictions in the RFC

assessment.  (D.I. 17 at 35-36)  The ALJ accounted for Podsiad's right upper extremity problems

by limiting her to lifting with the left, non-dominant hand, and by requiring her to avoid climbing and repetitive neck turning. *See* Tr. at 23. According to the Commissioner, the ALJ also accommodated Podsiad's left upper extremity impairments "to the extent they were credible, given Dr. Xing's findings of normal range of motion and normal muscle strength," by "finding that Podsiad could not perform her past relevant work." (D.I. 17 at 35 (citing Tr. at 28, 675)) The ALJ further accommodated Podsiad's difficulties with prolonged sitting by "including a 20 minute sit/stand option in the RFC assessment, and in the hypothetical question" posed to the vocational expert. (D.I. 17 at 35) Additionally, the ALJ's hypothetical question assumed the individual would need jobs that would generally be performed with one hand (right-hand dominant).

### c.   Discussion

When determining a claimant's RFC, the ALJ must consider all relevant evidence. This includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 41. The ALJ must provide some explanation when he has rejected relevant evidence or when there is conflicting probative evidence in the record. *See Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981). The Court is "unable to conduct [its] substantial evidence review if the ALJ fails to identify the evidence he or she rejects and the reason for its rejection." *Walton v. Halter*, 243 F.3d 703, 710 (3d Cir. 2001). However, a written evaluation of every piece of evidence is not required as long as the ALJ at least minimally articulated his analysis for that particular line of evidence. *See, e.g,. Middlemas v. Astrue*, 2009 U.S. Dist. LEXIS 19090, at *29 (W.D. Pa. Mar. 3, 2009). The ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it. *See id.* Moreover, it is not for the

Court to re-weigh the various medical opinions in the record. *See Monsour*, 806 F.2d at 1190. Instead, the Court's review is limited to determining if there is substantial evidence to support the ALJ's weighing of those opinions. *See id.*

The ALJ afforded controlling weight to the opinions of Podsiad's treating physicians (Drs. Frieman, Desai, and Xing). Tr. at 27. However, Podsiad contends that the ALJ erred by not including the restrictions regarding her ability to frequently use her hands, arms, and fingers. (D.I. 13 at 18) Podsiad states that her treating physicians opined that: (1) she had permanent partial loss of her right upper extremity from neuropathic pain; (2) she should be *limited* in all computer use, stamping or various paperwork focused on using her hands, handwriting, and performing tasks to meet service standards involving hand use; (3) prolonged sitting and using both hands *could* aggravate Podsiad's chronic pain syndrome; and (4) the severe limited use of her upper right extremity meant that she could not perform computer work or writing for *more than five minutes*. *See id.* at 15-16.

The Court agrees with the Commissioner that the ALJ fully accommodated these restrictions in his RFC for Podsiad. The ALJ tailored Podsiad's RFC to accommodate her right upper extremity problems by limiting her to lifting with the left, non-dominant hand only and precluding her from balancing, climbing, stooping, and repetitive neck turning. Tr. at 23. The ALJ also required Podsiad to avoid prolonged sitting or standing. *Id.*

> **3.**   **Whether the ALJ failed to comply with SSR-96-6p by ignoring the opinion of Dr. Borek (one of the state agency's non-examining physicians) without providing reasons for his rejection**
>
> **a.**   **Podsiad's arguments**

Podsiad contends that, pursuant to Social Security Regulation 96-6p, findings regarding the nature and severity of an impairment made by state agency consultants must be treated as

expert opinion evidence of non-examining sources, and an ALJ "'may not ignore those opinions and must explain the weight given to those opinions in [his or her] decisions.'" (D.I. 13 at 20 (quoting SSR 96-6p)) Where there is conflicting expert opinion evidence, there is a particular need for the ALJ to explain the reasoning behind his or her conclusions. *See* D.I. 13 at 20 (citing *Cotter*, 642 F.2d at 706). In the absence of such explanation, a case will be remanded. *See Cotter*, 642 F.2d at 706.

In making his RFC assessment, the ALJ concluded that Podsiad's RFC was for light work with some additional limitations. Tr. at 23. This RFC assessment contradicts Dr. Borek's assessment. The ALJ adopted fewer limitations than those identified by Dr. Borek for reaching, handling, and holding with the upper extremities, as well as the weight restrictions on lifting. Podsiad argues that if the full set of restrictions outlined by Dr. Borek had been accepted by the ALJ, the vocational expert's opinion as to what jobs Podsiad could perform in the national economy would have been impacted. (D.I. 13 at 21)

> **b.      The Commissioner's arguments**

The Commissioner argues that there is no conflict between Dr. Borek's report and the other state agency medical consultant because "Dr. Borek" concluded in his addendum to his February 2005 RFC assessment that Podsiad's RFC was for a limited range of light work. (D.I. 17 at 35 (citing Tr. at 342)) This comports with the other state agency medical consultants' findings and, hence, there was no conflict for the ALJ to explain in his decision.

> **c.      Discussion**

As noted above, an ALJ must provide some explanation when he has rejected relevant evidence or when there is conflicting probative evidence in the record. *See Cotter,* 642 F.2d at 706-07. The Court concludes that the ALJ erred by not explaining his reasons for rejecting the

37

RFC suggested by Dr. Borek. As discussed earlier, Dr. Borek's July 28, 2005 addendum to his assessment of Podsiad's file indicated that Podsiad's maximum RFC was for *sedentary work*, considering her morbid obesity and other health issues.[26] Tr. at 339. "Sedentary" work involves lifting no more than 10 pounds at a time, 20 C.F.R. § 404.1567(a), whereas "light" work can include lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, 20 C.F.R. § 404.1567(b). Dr. Borek further restricted Podsiad to *occasionally* lifting 10 pounds, *frequently* lifting 5 pounds, and non-continuous use of both her upper extremities. Tr. at 329-40. Yet, the ALJ's RFC determination stated that Podsiad could lift up to 10 pounds *frequently* (Tr. at 23), which is seemingly based on Dr. Kim's opinion that Podsiad could lift a maximum of 10-20 pounds (Tr. at 27). The ALJ did not explain his reasoning for rejecting Dr. Borek's opinion as to Podsiad's weight-lifting restrictions. The Court agrees with Podsiad that had the ALJ utilized Dr. Borek's weight-lifting restrictions, Podsiad's RFC determination would have been affected. Remand is thus warranted on this basis. *See, e.g., Reefer*, 326 F.3d at 381-82 (holding that ALJ must explain decision to credit one medical report over another); *Fargnoli*, 247 F.3d at 42 (same).

### 4. Whether the ALJ erred as a matter of law by failing to consider the impact of Podsiad's obesity on her ability to work

#### a. Podsiad's arguments

Podsiad insists that although the ALJ considered her obesity as a severe impairment, he failed to comply with Social Security Regulation 02-01p by not considering the impact of the obesity on her overall ability to work. SSR 02-01p provides, in pertinent part:

---

[26]The Commissioner misinterprets page 342 of the Transcript as the July 28, 2005 addendum written by Dr. Borek. (D.I. 17 at 15) As Podsiad points out in her reply brief, Transcript page 342 is actually a form completed by the disability adjudicator (apparently a non-physician) prior to Dr. Borek's review of Podsiad's file. (D.I. 18 at 4)

> [I]n the absence of record evidence to the contrary, the ALJ will accept a diagnosis of obesity given by a treating source or by a consultative examiner. Obesity will be considered a severe impairment when, alone or in combination with another . . . impairment(s), . . . it significantly limits an individual's physical or mental ability to do basic work activities.

> \*\*\*

> The combined effects of obesity with other impairments may be greater than might be expected without obesity.

Applying the accepted criteria to determine levels of obesity, Podsiad argues that she would be classified as "Obesity, Class III." (D.I. 13 at 26 (citing Tr. at 337))  However, according to Podsiad, the ALJ did not inquire into whether Podsiad's weight affected her functioning, despite noting that obesity was a severe impairment.  Tr. at 21.  Podsiad contends that such an inquiry would have affected her RFC determination.

### b.    The Commissioner's arguments

The Commissioner insists that the ALJ fully considered Podsiad's obesity in determining her ability to work. (D.I. 17 at 36-38)  The ALJ found that Podsiad's obesity was a severe impairment at step two of the sequential evaluation process.  Tr. at 21.  He also considered the effect of her obesity in combination with her other impairments on her functional capacity when he noted that "[o]besity is not a listing-level impairment but its effect as a possible exacerbating factor on the claimant's orthopedic impairments has been taken into account in arriving at the [RFC] indicated below."  Tr. at 23.  The Commissioner also argues that the ALJ considered the state agency physicians' opinions regarding Podsiad's obesity and "the fact that Dr. Borek" and Dr. Kim found Podsiad capable of performing a limited range of light work despite her obesity. (D.I. 17 at 37)  Additionally, the ALJ included Podsiad's obesity in formulating the hypothetical

question that he posed to the vocational expert at the administrative hearing.  Tr. at 676.

### c. Discussion

Podsiad's argument that the ALJ erred by failing to explicitly inquire into how her obesity

affected her ability to work is unpersuasive.  There is no requirement that an ALJ consider

impairments that a claimant does not allege are disabling – and Podsiad did not, in either her

application or at the hearing, allege that her obesity was disabling.  *See Rutherford*, 399 F.3d at

552-53 (holding that, where claimant did not allege obesity as a disabling limitation at hearing or

in benefits application, ALJ implicitly considered claimant's obesity by relying on medical

records and remand for explicit consideration was not required).  Here, the ALJ elicited

testimony from Podsiad regarding her weight, height, her recent weight loss, and her plans to

continue trying to lose weight.  Tr. at 658.  He also explicitly noted that the individual about

whom he was questioning the vocational expert weighed 267 pounds.  Tr. at 676.  Finally, the

ALJ explicitly found that Podsiad's obesity was a severe impairment (though not a listing-level

impairment), and further noted that the effect of Podsiad's obesity on her "orthopedic

impairments [was] taken into account in arriving at the residual functional capacity indicated

below."  Tr. at 23.

### 5. Whether the ALJ failed to sustain his burden of establishing that there is other work in the national economy that Podsiad can perform

#### a. Podsiad's arguments

Podsiad contends that when the ALJ found that Podsiad could not return to her past

relevant work, the burden of proof shifted to the Commissioner, "who must demonstrate that the

claimant is capable of performing other available work in order to deny a claim of disability."

*Plummer,* 186 F.3d at 428.  Podsiad argues that the ALJ failed to carry this burden because the

hypothetical question posed to the vocational expert – the answer to which formed the basis of the ALJ's RFC determination – was deficient as a matter of law.  Podsiad asserts that the hypothetical question posed by the ALJ did not "comprehensively" describe her impairments. Therefore, the vocational expert's opinion was deficient and cannot establish that the ALJ carried his burden to prove she could perform other available work.  (D.I. 13 at 27)

### b.    The Commissioner's arguments

The Commissioner maintains that the ALJ properly formulated the hypothetical question posed to the vocational expert, in that he only utilized the limitations that were supported by the record.  (D.I. 17 at 39; *see also* Tr. at 676-78.)  Thus, the vocational expert's testimony in response to that question regarding the existence of jobs that Podsiad could perform constitutes substantial evidence to support the ALJ's determination that Podsiad is not completely disabled from engaging in all vocational activity.

### c.    Discussion

An ALJ's RFC determination "must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Having determined that the ALJ must explain his reasoning for rejecting Dr. Borek's opinion, and that Podsiad's RFC may be affected by that explanation, it follows that the appropriateness of the ALJ's reliance on the vocational expert's opinion may be impacted. *See Eskridge v. Astrue*, 569 F. Supp. 2d 424, 440 (D. Del. 2008).

## V.  **RECOMMENDED DISPOSITION**

For the reasons set forth above, it is recommended that the parties' cross-motions for summary judgment be granted in part and denied in part, and that Podsiad's application for DIB be remanded to the Commissioner for further proceedings consistent with this Report.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections **of no longer than ten (10) pages within fourteen (14) days after being served with a copy of this Report and Recommendation**.  Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 Fed. Appx. 924, 925 n.1 (3d Cir. 2006).  **A party responding to objections may do so within fourteen (14) days after being served with a copy of objections; such response shall not exceed ten (10) pages.  No further briefing shall be permitted with respect to objections without leave of the Court.**

The parties are directed to the Court's Standing Order In Non-*Pro Se* Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the Court's website, www.ded.uscourts.gov/StandingOrdersMain.htm.

Dated: February 22, 2010

_____
Hon. Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE